**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-2008
_____

UNITED STATES OF AMERICA

v.

ZAVIA L. JOHNSON,
aka Lester Hayes
aka Xavier Johnson,
Appellant
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Criminal No. 1-12-cr-00070-001)
District Judge: Honorable David S. Cercone
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
April 13, 2018
_____

Before: CHAGARES, VANASKIE, *Circuit Judges*, and BOLTON, *District Judge*[1]

(Filed: July 31, 2018)
_____

OPINION[*]
_____

_____

[1] The Honorable Susan R. Bolton, Senior District Judge, United States District Court for the District of Arizona, sitting by designation.

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

VANASKIE, *Circuit Judge*.

Appellant Zavia Johnson appeals his judgment of conviction following the District Court's denial of his motion to suppress evidence gathered after the seizure and search of his car following a traffic stop. On appeal, Johnson challenges the duration of the traffic stop, the existence of probable cause to seize the rental vehicle he was driving, and the omission of certain facts from the officer's affidavit of probable cause presented in support of a search warrant application. Discerning no clear error in the District Court's findings of fact, and concluding that its legal analysis is consistent with governing precedent, we will affirm the judgment of conviction entered on April 19, 2017.

## I.

On the morning of November 2, 2012, Pennsylvania State Trooper Gary S. Knott was traveling on Interstate 79 in Erie County, Pennsylvania, when he observed a Nissan Altima ahead of him lingering in the passing lane.[2] Trooper Knott suspected that the driver lacked "situational awareness" because he appeared not to have noticed Trooper Knott's marked cruiser driving up behind him. (App. at 146.) Trooper Knott testified that he moved into the right-hand lane and pulled alongside the Altima, whose driver "looked over at [Trooper Knott] and immediately . . . went from a slouched position very casually and . . . jumped and grabbed the steering wheel with two hands, [causing] the vehicle to veer to the left on top of the fog line on the left side of the road." (*Id.* at 147-

---

[2] It is a violation of the Pennsylvania Vehicle Code to proceed in the left-hand lane absent a legally-permitted purpose. *See* 75 Pa. Cons. Stat. § 3313(d)(1).

48.) The driver then maneuvered his car into the right-hand lane in front of Trooper Knott's cruiser, at which point Trooper Knott decided to pull the vehicle over. A dashboard camera in Trooper Knott's vehicle recorded the entirety of the Trooper's encounter with Johnson.

As Trooper Knott approached the Altima, he noticed that the driver's hands were trembling and that his nervousness seemed "significantly higher than the average motorist who's not involved in any other criminal activity." (*Id.* at 153.) The driver introduced himself as Zavia Johnson and told Trooper Knott that he was traveling from Rochester, New York, to Pittsburgh, Pennsylvania, to purchase alligator skin boots. Trooper Knott took Johnson's New Jersey driver's license and two rental car contracts back to his cruiser to verify them. Trooper Knott soon learned that Johnson's real name was Lester Hayes, and that he had several other aliases and an extensive criminal record.[3] Trooper Knott also learned that the Altima's rental contract had expired. There then ensued a lengthy effort to ascertain whether Johnson was in legal possession of the rental vehicle. About fifty minutes after Trooper Knott pulled Johnson over, he was informed that Johnson was in lawful possession of the car.

In the meantime, Trooper Knott was confronted with suspicious incidents. About seven minutes into the traffic stop, a silver car pulled up behind Trooper Knott's cruiser, remained at a distance of 300 yards away for approximately forty seconds, and then drove away. Based on Trooper Knott's experience and training, he knew that drug

---

[3] For consistency throughout this opinion, we will refer to Appellant as Johnson.

3

traffickers often traveled together in several cars, and believed the silver car was a "trail vehicle[]." (*Id*. at 185.) He decided to call for back-up to verify whether the car was related to Johnson.[4]

Suspecting drug trafficking activity, Trooper Knott also summoned a State Police canine unit to conduct a drug sniff of Johnson's car. About forty minutes after the stop, Corporal Brian Peters arrived with his drug detection dog, Iggy, who is trained to detect marijuana, cocaine, heroin, and methamphetamine. Trooper Knott briefed Corporal Peters about Johnson's criminal record, his nervousness, and a strong odor of a fragrance emanating from Johnson's car. Corporal Peters then approached Johnson's passenger window and had a conversation with him, where Johnson asserted that his name was Zavia Johnson and denied using aliases. Johnson told Corporal Peters that he had several businesses in Rochester, and that he was traveling to Pittsburgh to conduct business and see his family.

About one hour into the traffic stop, Trooper Knott informed Johnson that he suspected that criminal activity was afoot based on Johnson's nervousness and the fragrance emanating from his car. Trooper Knott had Johnson exit his vehicle and read Johnson his *Miranda* rights, but assured Johnson that he was not under arrest. He also conducted a pat down of Johnson. Trooper Knott told Johnson that he knew about his aliases and criminal record, to which Johnson responded that he had used different names in the past.

---

[4] The silver car turned out to be unrelated to Johnson or the traffic stop.

Trooper Knott requested consent to search the Altima, which Johnson denied. Trooper Knott then informed Johnson that Corporal Peters and Iggy were going to conduct a scan of his Altima. About an hour and five minutes after the stop, Corporal Peters and Iggy conducted their scan of the Altima. Corporal Peters testified that, before he and Iggy reached the Altima, Iggy's "head was raised, his mouth closed, he was sniffing, [and] his head was drifting back and forth," which Corporal Peters considered to be the first step of "alert" behavior. (*Id*. at 385.) Corporal Peters testified that although Iggy did not "indicate," or, locate the source of the odor, he still "alerted to the presence of [a] controlled substance." (*Id*. at 387.)

Following Iggy's alert, Trooper Knott determined that he had probable cause to search the car. He decided to seize the car and apply for a search warrant, but told Johnson that he was not in custody and was free to leave. The tow truck arrived almost an hour and forty minutes into the stop, and towed the car to the Edinboro Police Department, the closest facility where Trooper Knott could apply for the search warrant. Afterward, Trooper Knott drove Johnson (who rode in the back of the cruiser to the police station) to a Greyhound bus station.

After dropping Johnson off, Trooper Knott returned to the police station and learned that the magistrate to whom he intended to apply for the warrant would not be available for another four hours. Trooper Knott was concerned about leaving the Altima at the police station because it would not be in "a completely secure facility that only a law enforcement officer would have access to," so he received instruction from his

5

supervisors to conduct an inventory search of the car pursuant to department policy. (*Id.* at 195.) The search revealed large sums of cash and bricks of heroin in the trunk.

Trooper Knott then had the Altima towed to a Pennsylvania State Police facility, and returned to the Greyhound bus station and arrested Johnson. Afterward, Trooper Knott applied for a warrant to search the Altima, and submitted a five-page supporting affidavit of probable cause. A Pennsylvania magistrate granted the warrant, and the search revealed 175 bricks of heroin and $7,000, among other items of an incriminating nature.

Johnson was charged in a one-count indictment with possession with intent to distribute 100 grams or more of heroin, in violation of 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(B)(i). He moved to suppress evidence and statements obtained through the traffic stop, seizure, and search of his car. He also filed a supplement to his suppression motion where he cited several statements in Trooper Knott's affidavit and argued that these allegedly false statements destroyed probable cause. (App. at 22.) The District Court held a two-day suppression hearing, where the government presented testimony of Trooper Knott, Corporal Peters, and Corporal Michael T. Ruhf—a certified canine handler whose responsibilities include training and certifying police dogs.

Following the hearing, the District Court denied Johnson's suppression motion. First, the District Court found that the initial traffic stop of Johnson's Altima was reasonable, given that the dashboard camera video showed Johnson driving in the passing lane in violation of the Pennsylvania Vehicle Code. The District Court next found that Trooper Knott did not unreasonably prolong the length of the traffic stop. In particular,

the District Court reasoned that Trooper Knott's inquiries into Johnson's license and rental car contracts "w[ere] necessary and reasonable [processes that] naturally prolonged the stop." (*Id.* at 14.) The Court further determined that, once Trooper Knott learned of Johnson's aliases and criminal record, he had "a valid reason to conduct further inquiry into the identity of the individual he had stopped." (*Id.* at 15.)

Second, the Court held that Trooper Knott had probable cause to seize and search Johnson's car based on Iggy's alert to the presence of drugs in the vehicle, and Trooper Knott's other observations. According to the Court, Corporal Peters' determination that Iggy had alerted to the presence of drugs was reasonable based on the dog's change in posture and respiration rate. The Court further held that Iggy's inability to "indicate" did "not detract from the alert behavior observed by Corporal Peters . . . ." (*Id.* at 20.)

Third, the District Court rejected Johnson's argument that the inventory search of the Altima "was nothing more than a pretext to further Trooper Knott's criminal investigatory search and therefore was illegal." (*Id*. at 644.) The District Court concluded that, since Trooper Knott had probable cause to search Johnson's car *before* he applied for the search warrant, the inventory search did not amount to a Fourth Amendment violation.

Finally, the District Court held that Johnson failed to show that Trooper Knott made several false statements in the search warrant affidavit, opining that certain omissions or statements would not have affected the magistrate's probable cause determination. (*Id*. at 23.) To the contrary, the Court found that Trooper Knott's decision to omit certain facts from the search warrant affidavit—including Johnson's

7

later admission that he used aliases when he was arrested—would have only *strengthened* the case against Johnson. The Court thus denied Johnson's motion and admitted the evidence.

Following the denial of his motion, Johnson pled guilty to the offense. He was sentenced to 180 months' imprisonment, followed by a ten-year term of supervised release. He timely appealed.

## II.

The District Court had jurisdiction under 18 U.S.C. § 3231, and we have jurisdiction under 28 U.S.C. § 1291. We review the denial of a motion to suppress "for clear error as to the underlying factual findings and we exercise plenary review over questions of law." *United States v. Brown*, 448 F.3d 239, 245 (3d Cir. 2006).

## III.

On appeal, Johnson renews his arguments that: (1) the traffic stop was unreasonably prolonged; (2) the officers lacked probable cause to seize and search the Altima because Iggy never alerted to the presence of a controlled substance in his car; and (3) the affidavit of probable cause contained material omissions. We find no merit in these contentions.

## A.

"[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez v. United States*, 135 S. Ct. 1609, 1612 (2015). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.*

8

at 1614. Such tasks include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 1615.

Johnson argues that Trooper Knott unreasonably prolonged the stop "[b]y not using the most expeditious and available means" to inquire into Johnson's rental car contracts. (Appellant's Br. at 64.) We disagree. As the government correctly notes, Trooper Knott "was unable to devote his singular attention to the rental car issue because he was dealing with identifying Johnson, [a] proper inquiry incident to a legal traffic stop." (Appellee's Br. at 54.) Moreover, there is nothing to indicate a lack of diligence in chasing down information from the car rental agency to verify that, even though the rental contract had expired, Johnson was authorized to possess the car.

We likewise reject Johnson's argument that the officers could have expedited the start of the dog sniff, which did not occur until twenty-five minutes after Iggy arrived, and more than one hour after the stop. Corporal Peters' delay in dispatching Iggy was not unreasonable, given that Corporal Peters was familiarizing himself with the case and Iggy was becoming accustomed to his surroundings. *See United States v. Holt*, 777 F.3d 1234, 1257 (11th Cir. 2015) (finding no unreasonable delays where drug dogs had arrived for vehicle scan and were dispatched after officer concluded a routine records check). We thus conclude that the length of the traffic stop was reasonable under the circumstances.

**B.**

9

"[A] dog's positive alert while sniffing the exterior of the car provides an officer with the probable cause necessary to search the car without a warrant." *United States v. Pierce*, 622 F.3d 209, 213 (3d Cir. 2010) (citations omitted). As testified to by the officers in this case, an "alert" is instinctual behavior displayed by a drug detection dog that includes "increased respiration and change in body posture when the dog initially encounters the odors he's trained to detect." (App. at 374.)

Johnson claims that the dashboard camera footage belies the District Court's finding that Iggy alerted. Johnson further maintains that Iggy's failure to alert dispelled suspicion that his vehicle contained drugs.

Admittedly, the dashboard footage is somewhat ambiguous. For instance, Corporal Peters and Trooper Knott can be heard discussing Iggy's behavior, where Corporal Peters seemed to express frustration with Iggy's performance during the sniff.[5] Corporal Ruhf also testified that, after reviewing the video, he could not say either way whether Iggy alerted. (App. at 345.) Nevertheless, the record contains sufficient evidence to support the District Court's finding that Iggy alerted. For example, in his supplemental investigation report, Corporal Peters wrote that, prior to the search, Iggy first alerted by "lift[ing] . . . his nose high and . . . sniffing the air with increased respirations." (*Id.* at 549.) Corporal Peters then wrote that Iggy alerted during the car scan by "lifting his head up over the trunk lid and stretching his neck out to sniff higher on the trunk deck." (*Id.*) We also agree with the government that, in light of the fact that

_____

[5] According to the government, Corporal Peters' frustration stemmed from Iggy's failure to indicate, despite his alert.

10

Corporal Peters and Iggy had been a unit since 2007 and underwent their most recent training one week before the traffic stop, "Corporal Peters . . . [was] in the best position to interpret his canine's response . . . ." (Appellee's Br. at 26.) We thus conclude that it was not clear error to find that Iggy alerted and that, based on the alert and other factors observed by Trooper Knott, probable cause existed to seize and search the car.

## C.

"The Fourth Amendment prohibits the intentional or reckless inclusion of a material false statement (or omission of material information) in a search-warrant affidavit." *United States v. Pavulak*, 700 F.3d 651, 665 (3d Cir. 2012) (citation omitted). "Materiality" is decided by inserting the allegedly-omitted facts into the affidavit and "then determin[ing] whether or not the corrected warrant affidavit would establish probable cause." *Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000) (citation and internal quotation marks omitted).

Johnson limits his appeal to one statement in Trooper Knott's affidavit: "[Corporal Peters] related to me that he observed a positive response from his dog indicating the odor(s) that he is trained to detect." (App. at 503.) Johnson contends that, even if Iggy alerted,[6] Trooper Knott's "failure to tell the magistrate that Iggy did not 'indicate,' or engage in the behavior he is trained to do, was a material omission . . . ." (Appellant's

---

[6] As we have concluded that the District Court did not clearly err in finding that the drug-sniffing dog did alert to the presence of narcotics, it necessarily follows that the District Court did not clearly err in finding that the statement in the probable cause affidavit that Corporal Peters informed Trooper Knott that Iggy had given a positive response for the presence of drugs was not false.

Br. at 36) (citing *United States v. Jacobs*, 986 F.2d 1231, 1234-35 (8th Cir. 1993) (holding that statement in affidavit of probable cause that drug dog "showed an interest in the [defendant's] package," but not informing the magistrate that the dog failed to fully alert, was a recklessly-made material omission.)) Johnson further argues that, once the statement is corrected, the affidavit fails to provide probable cause to seize and search his car.

Johnson is mistaken. A drug dog's "alert" to the presence of a controlled substance is enough to provide probable cause. *See Pierce*, 622 F.3d at 213 (citations omitted). While an "indication" would bolster the affidavit, it is not material to a probable cause finding.

**IV.**

For the reasons stated, we will affirm the judgment of conviction entered on April 19, 2017.